FREDERICK MESSING *vs.* WILMINGTON CITY RAILWAY COMPANY, a corporation of the State of Delaware.

*Case—Personal Injuries — Expectancy of Life — Life Insurance Tables—Evidence—Nonsuit.*

1. A standard table made by experienced life insurance experts is admissible evidence to go before the jury to be considered by them in connection with all the other circumstances in the case.

2. The Court directed that a nonsuit be entered which not being accepted the jury were directed to return a verdict for the defendant.

(*December 7-11, 1905.*)

LORE, C. J., and GRUBB and PENNEWILL, J. J., sitting.

*William F. Kurtz* for plaintiff.

*Walter H. Hayes* and *Andrew C. Gray* for defendant.

Superior Court, New Castle County, November Term, 1905.

ACTION ON THE CASE (No. 106, November Term, 1904), to recover damages for personal injuries alleged to have been sustained about noon on August 3, 1904, near the intersection of Elliott Avenue, Market Street and Vandever Avenue, and to have been occasioned by reason of one of defendant's Riverview cars negligently colliding with the horse and cart which plaintiff was then driving across Market street at that point, whereby the said plaintiff was thrown to the ground from the left shaft on which he was riding and injured.

The testimony concerning the accident and injuries, as adduced on the part of the plaintiff, was in substance as follows:

The plaintiff testified that on August 3, 1904, about noon, he was driving in a fast walk on the right-hand side of Market street toward Market street bridge from Riverview cemetery with a horse and empty cart; that he was on his way to get a load of cinders in town; that the Darby trolley car was coming into Wilmington on the same side of Market street on which he was traveling. That he was sitting at the time on the left-hand shaft of his cart with the lines in his right hand and his left arm resting on the horse. The plaintiff further testified as follows:

I drove down to that church where the fountain is (referring

to the public fountain south of the intersection of Elliott Avenue and Market street), and while I was there an open Darby car came and stopped right there two or three steps ahead of me, and then I saw passengers going out and in on the right-hand side of the car and when I looked around I could see nothing in the road and I went ahead of the Darby car two or three steps and turned on the left side on a little slant but almost straight to go over to Vandever avenue across the track. I looked on Market street and when I got in front of the Darby car I looked again and could see nothing in the road. When I was in the middle of the north-bound track and the horse nearly over the track, the Riverview car came out on the north-bound track on the east side of Market street and ran against my cart and throwed me out, and I knew nothing more. Some people carried me away and an ambulance came and hauled me home. When the horse went across in front of the Darby car he was walking at a pretty good step, about three miles an hour. I was seventy years old the 14th day of the same month that I was hurt.

On cross examination the plaintiff further testified in substance as follows:

It was a clear day. There was no obstruction on the road to prevent me seeing the car or to prevent the motorman of the car seeing me. I could see down Market street about two squares. My eyesight was good and I could see pretty far for one of my age. I wear glasses only when I read. I knew this locality but did not know the names of streets very well. In going from my home to my work at Riverview Cemetery I rode on the Riverview street car line to and from my work daily past the place of the accident.

*William R. Todd,* a police officer, testified on behalf of plaintiff in effect as follows:

I am a police officer of the city of Wilmington, and my beat is what is known as the Tenth District, over in the Ninth ward. I was present the day of the accident to Mr. Messing, and to the

best of my recollection I was standing at the time on Vandever avenue near Market street when the old gentleman (meaning the plaintiff) came around driving a cart in front of the Darby car and heading towards Vandever avenue. The Darby car had stopped, I suppose for the purpose of people getting on and off. I did not notice anyone get on or off, as I was on the opposite side of the street down Vandever avenue a short distance from the corner. To the best of my recollection, the front end of the Darby car was then near about on a line with the Vandever avenue curb line, that is, the upper curb line. The first I noticed of the plaintiff was when he was coming around the front of the car that was standing still. I judge at that time that the Riverview car was about three or four lengths of the car down Market street from the old gentleman, though I would not say positively. The Riverview car was an open car. I don't know how long an open Riverview car is, but I judge about twenty-five or thirty feet long and eight to ten feet wide and fourteen feet high. I could not gauge it exactly as to how fast the car was coming but I judge it was moving five or six miles an hour. I don't remember hearing the bell ring. When the car struck the plaintiff, if I remember correctly, the head of the horse or front part of the horse was near about the outside of the north-bound or easterly track, that is, the track towards the Delaware River. I don't think the cart was on the track. The horse was over on the side towards Vandever avenue. When the car struck the horse and wagon, it shoved the horse or knocked him up the street, you might term it, towards Twenty-second street. When I first noticed the Riverview car the plaintiff was coming around the end of the Darby car ; just about turning towards Vandever evenue, and if I remember right, he seemed to be looking towards me. I was on the east side on Vandever avenue, towards which the plaintiff was coming. After the old gentleman approached the street on the track, I could not say positively whether the car slackened up or not, but I think to the best of my recollection that it did gradually get slower.

*Harry S. Pierce* testified on behalf of the plaintiff in substance as follows:

I saw this accident. I was on the easterly side of Market street about opposite No. 2016 Market street, walking leisurely along reading a little book of accounts I had at the time, some notes I had, and I heard a car bell ringing—I think it was the Darby car bell ringing to hold the Vandever Avenue car—and I looked up from my book and as I looked, the horse and cart were in front of the Riverview car on the north-bound track and the horse was turning to the left-hand side when the car struck the left-hand side of the cart, and it swung the cart right straight around, but the horse faced towards Twentieth street. It was on the track that the Darby car was on. The Darby car was standing over about the public fountain on the south-bound track, and the horse was facing in the direction of the Darby car. The cart was on the east side of Market street as compared with the horse. This was an instant before the accident. The horse and cart were moving off the track at the time of the collision, and I evidently supposed the man was trying to get off the track. I cannot calculate speed very good, although I suppose the Riverview car was running at the rate of eight miles an hour. I think it was. I did not hear the bell of the Riverview car, and to my knowledge it did not ring. I judge when the car hit the cart that the rear end of the cart was on a line with the lower end or curb of Vandever Avenue.

*Harry L. Maier*, a civil engineer, testified that the width of Market street at Elliott Avenue was 65 feet six inches, that the width of Vandever avenue was sixty feet, that the grade of Market street going north as it approached Vandever Avenue from Twentieth street to Concord Avenue was an ascending grade of 2 7-10 feet per hundred feet; that the distance from the center stone of Elliott Avenue to the center stone of Vandever Avenue was 101 feet, five inches; that the southerly side of Elliott Avenue, if extended, would strike almost the northeast corner of Vandever Avenue; that the width of the sidewalks on each side of Market street measured 12 8-10 feet; that the space between the western curb and the west-

ernmost track of the south-bound track was 12 75-100, feet and that the width of space between the eastern curb of Market street and the easternmost track of the north-bound track was 12 75-100 feet; that the width of the south-bound track was 5 2-10 feet, and that the width of the north-bound track was the same; that the distance between the two tracks was four feet.

*Dr. John C. Fahey* a practicing physician, testified on behalf of the plaintiff, in substance, as follows: I was called in to attend Mr. Messing for this injury. Dr. Ogle, who is now dead, was also called in at the time. I found Mr. Messing suffering with a fractured left hip. He was bruised and jarred and seemed to be suffering a great deal from shock. I cannot recall exactly, but there were one or two lacerated wounds on the body. I had him under my supervision for possibly six months; I think, in bed for three months. The fractured hip is the cause of his lameness and is a permanent injury. He will never be any better than he is. He suffered for three or four weeks or a month, acute pain. I cannot recall whether the sand bags were weighted or not, but they were if necessary. There is no doubt but what there is still more or less pain in his hip on any active motion of the hip or the limb.

*Charles B. Palmer,* called as a witness on behalf of the plaintiff having testified that he was a life insurance agent, was asked by Mr. Kurtz the following question:

Q. Will you tell the Court and the jury what the expectancy of life is of a man 70 years of age, according to the standard tables of life insurance companies?

(Objected to by Mr. Gray, of counsel for defendant, as irrelevant to the issue in the case. Mr. Gray contended that the injuries proved were not of a permanent character; that the plaintiff was in court and exhibited himself as a witness to the jury, that the jury had heard his testimony and it was thus enabled to form whatever estimate was proper to be formed as to the extent of his injury.)

*Mr. Kurtz:*—The defendant, if liable, is liable for the immediate and necessary consequence of the accident, and we proved that the consequences of the accident were a *permanent* injury. In

order to give the jury an idea—should they desire to give the plaintiff damages—as to what the extent of the injuries are, they must know, what they do not know as a matter of fact, how long this man is going to live, and the only thing available to prove that is the insurance table, which shows the expectancy of life that he will have; and thus the jury will have some standard by which to estimate the amount which they think they should properly award him; and that is just as much a fact which they have a right to consider in forming an estimate as are the pain and suffering or any other injury which enters into it.

*McMahon vs. Hughes Brothers and Bangs, 5 Pennewill, 178 Knapp vs. Sioux City and Pacific Railway Company, 61 Iowa, 41.*

GRUBB, J.:—It is for the jury to say to what extent the injuries would deprive him from earning money. Suppose they should arrive at the conclusion that by reason of the injuries testified to the plaintiff is disabled to a certain extent so that his earning capacity is reduced say $100 a year; then the question would be—as he is seeking to recover for permanent injuries which he claims will continue as long as he lives—whether it would not be pertinent then to show how many years he would live? Say it was a dimunition in earning capacity of $100 a year that was proved and he lived for ten years, it would amount in the aggregate to $1000. And if it is established to the satisfaction of the jury that the plaintiff is injured to the extent of $100 a year in his earning capacity, how are they to know what the aggregate number of years of diminished earning capacity would be unless you show by evidence how many years he would probably live and be able to work if he had not been injured? What evidence of this is there, then?—that of experts. These life tables have been made and established by experts and embody their experienced opinions and judgment. Whether such evidence is conclusive testimony or not is not the question; it is whether it is admissible testimony or not.

I think that, as expert testimony tending to show the probable number of years that the plaintiff would have his earning capacity

reduced, and therefore the probable amount of his diminished earning capacity for the number of years he would live, it is admissible evidence before the jury for them to consider; and therefore should be admitted.

I would like to know what answer there can be to that.

*Mr. Gray:*—I think the fallacy in reasoning for the admission of insurance tables to show the expectancy of life where the injuries may be permanent but the disability is not total, is shown very well in the Iowa case that Mr. Kurtz has just cited, where it speaks of the alternative of the death or the natural disabilities that come upon human beings for work on account of old age. They furnish a false standard to the jury from which they measure the compensation, because in the natural progress of a human being towards the grave, when a man approaches old age, his capacity for work must be less, and if he lived to the full allotted span of life it is the natural result of the gradual decay in human nature that he is not able to work up until the time of his death but is incapacitated from the infirmities attendant upon old age. So that when you get the expectation of life for a man where the disability is not permanent, with the witness upon the stand and his personal appearance and his description of his physical condition before the accident before the jury. I find the latter to be a much safer standard for the jury to determine the extent of his injuries by, than a life insurance table which gives merely his expectancy of life and not his expectancy of work.

It becomes admissible in case of death because the deceased cannot be put upon the stand for the inspection of the jury, consequently they have to consider him as an average man, which the insurance tables compute. The matter of damages in case of death go to the estate that the man would have left, and the jury not being able to see him or judge for themselves from his physical appearance or from his testimony as to his physical condition before the accident or what his probabilities are, by the use of the expectancy of life tables would have some standard by which to estimate how

many years he would probably have for the accumulation of an estate.

GRUBB, J.:—Would not that, however, be a stronger reason why, for the just protection of the defendant, it should be excluded where the plaintiff is dead, because otherwise the defendant might be absolutely bound by the life insurance table and the jury obliged to assume that he was the average healthy man, when, if they had him alive before them they might see that he was not likely to live or be able to work so long? I think the reason is stronger for the admission in case of life than of death.

My position is that it is a standard table made by experienced life insurance experts which is admissible evidence to go before the jury to be considered by them in connection with all the other circumstances in the case.

PENNEWILL, J.:—My recollection is that in at least one case such testimony was admitted because the injury was proved to have resulted in total disability, but in the case of *McMahon vs. Bangs*, (*5 Pennewill, 178,*) which is the last case as far as we know in which the question was raised, it was admitted where the injury did not, as in this case result in total disability. There the plaintiff, a boy, was struck on the leg by a rock hurled from a blast and the court unanimously admitted the testimony in that case. Upon the authority of that case I have to agree to the admission of this testimony.

LORE, C. J. (dissenting):—There was a case in which I sat with Judge Boyce, and we ruled the other way. I was very clear that it was establishing a false standard. Where a man is dead you must get some basis for ascertaining the value of his life to his estate, and the jury would have to depend upon the number of years he would have lived, and his earning capacity all through those years. That is a necessity, because the jury have not the man before them and could make no estimate at all. But here is an action,

not for death or anything growing out of death, but it is an action to recover for damages to a man who is here with all the conditions surrounding his life testified to before the jury, the injury and everything connected with it, from which the jury have the actual means of judging for themselves what in their judgment is the extent of the injury.

I am very clear that the testimony ought not to be admitted, but the majority of the Court hold otherwise.

(The witness was then asked by Mr. Gray the following question): From what data is the table you have there constructed?

A. From the experience of healthy insured lives in the Mutual Life Insurance Company and in other companies in this country and also in European countries.

(Mr. Gray again objects to the testimony offered and makes the following contention):

*Mr. Gray:*—Mr. Kurtz has offered this table to show the expectancy of life of the average man, and there cannot be such a table given as proper evidence to show to this jury, unless such a table is made by an expert qualified to make it from the tables of mortality of a country or the district in which the man lived, of all the population and not of a selected or special class.

LORE, C. J.:—A majority of the Court overrule the objection. My opinion is that these insurance tables do not apply to this case. I am not going beyond that.

*By Mr. Kurtz:*

Q. That is a standard table by which the expectancy of life is shown by life insurance companies? A. It is used I believe by all these companies.

BY CHIEF JUSTICE LORE:

Q. That is made up from a list of insured people only? A. I suppose they were insured when they started in, but nobody is insured above 70, yet the table runs to 95.

Q. Then the table covers a class of people that they don't insure? A. They cannot insure them above 70, but they start in somewhere.

*By Mr. Kurtz:*

Q. It is a standard table used by life insurance companies in all cases? A. Yes, sir.

Q. What would be the expectancy of life of a man within two weeks of seventy years of age?

(Objected to by counsel for defendant on the same grounds as before stated.)

LORE, C. J.:—A majority of the Court rule it in.

### MOTION FOR NONSUIT

Counsel for defendant moved for a nonsuit on two grounds viz.:

1. That there was no evidence of any negligence on the part of the defendant.

2. That there was evidence of contributory negligence on the part of the plaintiff.

LORE, C. J.:—The Court have very carefully considered this testimony, and after the most careful consideration, a majority of the Court are satisfied that a nonsuit should be entered.

MR. KURTZ:—The plaintiff refuses to accept a nonsuit.

LORE, C. J., charging the jury :

Gentlemen of the jury :—In the case that is now on trial before you the plaintiff seeks to recover from the defendant for personal injuries, which he claims that he sustained by reason of the negligence of the defendant. The gist of the action is negligence. The plaintiff has produced his evidence, and upon that a motion was

made for a nonsuit, which the Court was about to order, but he declined to accept a nonsuit and asked us to charge you.

We will say to you, gentlemen, that after a careful consideration of the plaintiff's case as he has made it, giving our best judgment and fullest consideration to the evidence, and all proper and reasonable conclusions that may be reasonably drawn therefrom, we are unable to see that the plaintiff has made such a case of negligence as would entitle him to recover, and if we were to let the case go further, and upon that testimony alone you were to return a verdict for the plaintiff, it would become our duty, in our view of the law, to set aside that verdict. So that the time from this on would be simply consumed with no good purpose.

While the Court always prefer that a question of fact should be determined by the jury, yet when those facts, in the judgment of the Court, under the rules of law governing them, would not warrant a verdict, in that event it becomes a duty—an unpleasant one, but nevertheless a duty—from which we cannot shrink. We therefore say to you that in view of the facts and the evidence as we have stated it, and the rules of law governing it, a majority of the Court direct you to return a verdict for the defendant.

Verdict for defendant.